**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Planned Parenthood Arizona, Inc.; Jane
Doe #1; Jane Doe #2; Jane Doe #3; Eric
Reuss, M.D.,

                    Plaintiffs,

v.

Tom Betlach, Director, Arizona Health
Care Cost Containment System; Tom
Horne, Attorney General,

                    Defendants.

No. CV-12-01533-PHX-NVW

**ORDER**

**AND**

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

I.   BACKGROUND ...................................................................................... 1

  A.   The Challenged Arizona Act ..................................................... 1

  B.   The Medicaid Program .............................................................. 2

    1.   Freedom of Choice Provision ......................................... 2

    2.   Waivers for Demonstration Projects ............................... 3

  C.   Arizona's Medicaid Program .................................................... 4

II.   PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION ............... 4

  A.   Plaintiffs Are Likely to Succeed on the Merits. ....................... 5

    1.   Plaintiffs Have a Right to Sue Under 42 U.S.C. § 1983 .................... 5

    2.   Plaintiffs Are Likely to Succeed on Their Claim that the Arizona Act Violates the Freedom of Choice Provision. ..................................... 11

      a.   The Plain Meaning of the Phrase "Qualified to Perform the Service" Refers to the Ability of the Provider to Perform Medicaid Services. ...................... 12

      b.   Section 1396a(p)(1) Does Not Give States Authority to Disqualify Providers for Reasons Unrelated to the Purposes of the Medicaid Act. ........................ 13

      c.   Agency Interpretations of § 1396a(a)(23) Are Entitled to Some Deference. ......................................... 17

  B.   Plaintiffs Will Suffer Irreparable Harm Without Injunctive Relief. .................... 20

  C.   The Balance of Equities Favors Plaintiffs. ............................... 21

  D.   Temporarily Enjoining Enforcement of the Arizona Act Is in the Public Interest. ................................................................. 22

III.   BOND ...................................................................................................... 23

IV.   DEFENDANTS' MOTION TO DISMISS COUNTS I AND II. .............................. 23

Before the Court is Plaintiffs' Motion for Preliminary Injunction (Doc. 6) and Defendants' Motion to Dismiss Counts I and II (Doc. 37).  For the reasons below, the Plaintiffs' Motion for Preliminary Injunction will be granted, and the Defendants' Motion to Dismiss will be denied.  This Order states the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52(a)(2).

## I.   BACKGROUND

### A.   The Challenged Arizona Act

Plaintiffs brought this action to enjoin the enforcement of Arizona Legislature HB 2800, 2nd Regular Session, 50th Legislature (2002) ("the Arizona Act"), which prohibits any health care provider who performs elective abortions from receiving Medicaid funding.  A.R.S. § 35-196.05.  The challenged portion of the Arizona Act provides:

> This state or any political subdivision of this state may not enter into a contract with or make a grant to any person that performs nonfederally qualified abortions or maintains or operates a facility where nonfederally qualified abortions are performed for the provision of family planning services.

A.R.S. § 35-196.05(B).  For the purposes of the Arizona Act, "nonfederally qualified abortion" is defined as "an abortion that does not meet the requirements for federal reimbursement under title XIX of the social security act."  A.R.S. § 35-196.05(F)(4).  In turn, an abortion that does not meet the requirements for federal reimbursement is any abortion except where the pregnancy is the result of rape or incest, or threatens the life or health of the mother.  Exec. Order No. 13,535, 75 Fed. Reg. 15, 599 (Mar. 24, 2010).  The Arizona Act therefore prohibits any person or entity that performs abortions, outside of those exceptions, from participating in Medicaid.  On May 4, 2012, Governor Jan Brewer signed the Arizona Act into law after the Act passed by wide margins in both houses of the Arizona Legislature.  Though the Arizona Act was scheduled to take effect on August 2, 2012, the parties in this case stipulated to a temporary restraining order that delayed implementation and enforcement of the Act pending the Court's ruling on Plaintiffs' Motion.  (Doc. 26.)

### B.      The Medicaid Program

The Medicaid program, established by Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq*., is a cooperative federal-state program created to provide medical assistance to needy families and individuals.  Under the Medicaid program, the federal government provides funds to states to offset some of the expense of furnishing medical services to low-income persons.  The program is jointly financed by the federal and state governments, and states administer the program according to federal guidelines.  42 U.S.C. § 1396 *et seq*.; 42 C.F.R. § 430.0.  States are not required to participate in the federal Medicaid program.  Once a state elects to participate in Medicaid, however, it must do so in accordance with federal statutes and regulations.   42 U.S.C. §§ 1396a(a)(1)-(83); *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990).

States that participate in the Medicaid program are required to develop a comprehensive plan for the provision of services that must be approved by the Secretary of Health and Human Services ("the Secretary").  42 U.S.C. § 1396a(a); *Wilder*, 496 U.S. at 502.   The Secretary delegates power to review and approve plans to Regional Administrators of the Centers for Medicare and Medicaid Services ("CMS").  42 C.F.R. § 430.15(b).   CMS reviews the state plan to determine whether its provisions are consistent with federal policy.  42 C.F.R. § 430.14.  CMS then exercises its delegated authority either to approve the state plan or to disapprove the plan after consulting with the Secretary.  42 C.F.R. § 430.15(b)-(c).

### 1.      Freedom of Choice Provision

Central to the dispute in this case, among the requirements for states to participate in the Medicaid program, "[a] State plan for medical assistance must – provide that:"

(A) any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required (including an organization which provides such services, or arranges for their availability, on a prepayment basis), who undertakes to provide him such services, and

(B) an enrollment of an individual eligible for medical assistance in a primary care case-management system . . . a Medicaid managed care

organization, or a similar entity shall not restrict the choice of the qualified person from whom the individual may receive services under section 1396d(a)(4)(C) of this title.

42 U.S.C. § 1396a(a)(23).  The Supreme Court has interpreted this freedom of choice provision to give Medicaid recipients "the right to choose among a range of qualified providers, without government interference."   *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 785 (1980).

Subparagraph (B) of § 1396a(a)(23) expands that protection in the context of family planning services.  The services described in 42 U.S.C. § 1396d(a)(4)(C) are "family planning services and supplies furnished . . . to individuals of child-bearing age . . . who are eligible under the State plan and who desire such services and supplies." Section 1396a(a)(23)(B) therefore provides an additional guarantee of an individual's free choice of providers of family planning services; the guarantee applies even in the context of managed care organizations, where free choice of providers otherwise can be limited by a state.   42 U.S.C. § 1396a(a)(23)(B); *see also* 42 U.S.C. § 1396n(b) (providing that the Secretary may waive free choice of providers in some circumstances to permit a state to set up a managed care delivery system, but that "[n]o waiver under this subsection may restrict the choice of the individual" in receiving family planning services).

Though participating states must comply with all of the requirements of Title XIX, including the freedom of choice provision, states retain some autonomy and flexibility in devising Medicaid plans.  Specifically, a state may establish "reasonable standards relating to the qualifications of providers . . . ." 42 C.F.R. § 431.51(c)(2).  A state may also exclude health care providers under certain circumstances: "[i]n addition to any other authority, a State may exclude an individual or entity . . . for any reason for which the Secretary could exclude the individual or entity from participation."   42 U.S.C. § 1396a(p)(1).

## 2.     Waivers for Demonstration Projects

- 3 -

In addition to the state plans approved by CMS, 42 U.S.C. § 1315 authorizes the Secretary to approve experimental or demonstration projects with the goal of encouraging states to adopt innovative programs that promote the objectives of Medicaid.  *Portland Adventist Med. Ctr. v. Thompson,* 399 F.3d 1091, 1093 (9th Cir. 2005).  To that end, the Secretary may waive certain Medicaid mandates generally applicable to state plans to allow a state to participate in these "demonstration projects."  42 U.S.C. § 1315(a).  The Secretary may approve such a project when it "is likely to assist in promoting the objectives" of the Medicaid program.  To do so, the Secretary may waive compliance with any of the requirements of § 1396a, which governs state plans for Medicaid, "to the extent and for the period [the Secretary] finds necessary to enable [a State] to carry out such a project."  42 U.S.C. §§ 1315(a)-(a)(1).

### C.  Arizona's Medicaid Program

Arizona participates in the Medicaid program through both an approved state plan under § 1396a and a demonstration project under § 1315.  Arizona is therefore bound by the requirements of § 1396a unless CMS expressly waives a requirement.  The state plan and the demonstration project together authorize the Arizona Health Care Cost Containment System ("AHCCCS"), the agency responsible for Arizona's Medicaid program.  AHCCCS operates a managed care system in which health care providers contract with managed care organizations rather than directly with the State.  To facilitate this demonstration program, CMS waived § 1396a(a)(23)(A) only "[t]o the extent necessary to enable the State to restrict freedom of choice of providers through mandatory enrollment of eligible individuals in managed care organizations and/or Prepaid Inpatient Health Plans."  (Doc. 51 at 6.)  CMS did not waive the additional guarantee of an individual's free choice of providers of family planning services in § 1396a(a)(23)(B).

## II.  PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs seek a preliminary injunction that would enjoin the implementation of the A.R.S. § 35-196.05(B).  A preliminary injunction is an extraordinary equitable

remedy which seeks to "preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  To be entitled to injunctive relief, a movant must demonstrate that: (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).  The burden of persuasion is on the movant, who must make "a clear showing" that each of the four prongs is satisfied.  *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (per curiam).

### A.    Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs' first argument is that the Arizona Act violates a Medicaid patient's right – derived from the § 1396a(a)(23) freedom of choice provision – to receive care from the provider of his or her choice.  Defendants contend in response that Plaintiffs do not have a right of action under 42 U.S.C. § 1983 to enforce the Medicaid freedom of choice provision, and that the State cannot violate Medicaid provisions because Medicaid is a voluntary program.

### 1.    Plaintiffs Have a Right to Sue Under 42 U.S.C. § 1983.

Under § 1983, persons are liable if they act under color of law to deprive individuals of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.  Although § 1983 authorizes lawsuits to enforce federal statutory rights, *Maine v. Thiboutot,* 448 U.S. 1, 4 (1980), it "does not provide an avenue for relief every time a state actor violates a federal law," *City of Rancho Palos Verdes v. Abrams,* 544 U.S. 113, 119 (2005).  To sue under § 1983, then, a plaintiff must allege a violation of an individual right, not merely a violation of a federal law.  *See Blessing v. Freestone,* 520 U.S. 329, 340 (1997).  Moreover, Plaintiffs bear the burden of showing that Congress intended for the statute at issue to create an enforceable right. *Gonzaga Univ. v. Doe,* 536 U.S. 273, 283–84 (2002).  It is only "*rights,* not the broader or vaguer 'benefits' or 'interests' that may be enforced under the authority of

[§ 1983]." *Id.* at 283.  The Supreme Court established a three-factor test in *Blessing* to determine whether a particular federal statute creates an enforceable right.  That test instructs courts to evaluate whether:

> (1) "Congress intended that the provision in question benefit the plaintiff"; (2) the plaintiff has "demonstrated that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence"; and (3) "the statute unambiguously imposes a binding obligation on the States," such that "the provision giving rise to the asserted right is couched in mandatory, rather than precatory terms."

*Ball v. Rodgers,* 492 F.3d 1094, 1104 (9th Cir. 2007) (quoting *Blessing,* 520 U.S. at 340-41).  If all three elements of the *Blessing* test are satisfied, a federal right is "presumptively enforceable by § 1983, subject only to a showing by the state that Congress specifically foreclosed a remedy under § 1983."  *Ball*, 492 F.3d at 1116 (internal quotation marks and citation omitted).

In *Gonzaga*, the Supreme Court directed courts to evaluate the first *Blessing* prong by examining whether Congress used "rights-creating" language to create individual rights that were "unambiguously conferred."  *Gonzaga*, 536 U.S. at 283-84.  As exemplars of statutory provisions that create § 1983 rights, the Court discussed Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972, both of which use the wording "[n]o person . . . shall . . . be subjected to discrimination." *Id.* at 284.

The Medicaid freedom of choice provision at issue here reveals congressional intent to create an individualized right.  Section 1396a(a)(23) is phrased in terms of the individual's right to select among qualified providers and is unmistakably focused on the specific individuals the provision is intended to benefit.  "A State plan for medical assistance *must* . . . provide that *any individual eligible for medical assistance* (including drugs) may obtain . . . ." 42 U.S.C. § 1396a(a)(23)(A) (emphasis added).  Further, in the family planning context, "[a] State plan for medical assistance *must* . . . provide that an enrollment of *an individual* eligible for medical assistance in a primary care case-management system . . . *shall not* restrict the choice of the qualified person from whom

- 6 -

*the individual* may receive services . . . ."   42 U.S.C. § 1396a(a)(23)(B) (emphasis added).   The language Congress used in these provisions includes paradigmatic "rights-creating terms" that evince congressional intent to confer individual rights.   *Gonzaga*, 536 U.S. at 284.   Indeed, it is "difficult, if not impossible, as a linguistic matter, to distinguish the import of the relevant Title XIX language – 'A State plan must provide' – from the 'No person shall' language of Titles VI and IX," that the Supreme Court identified as an exemplar.   *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 190 (3d Cir. 2004) (citing *Blessing*, 520 U.S. at 341); *see also Watson v. Weeks*, 436 F.3d 1152, 1161 (9th Cir. 2006) (endorsing the *Sabree* court's reasoning).   The language of the freedom of choice provision focuses on individuals and provides clear instructions for what the states must do to ensure that eligible individuals receive services to which they are entitled under the statute.   The provision does not, therefore, focus on the "aggregate services provided by the State, rather than the needs of any particular person."   *See Gonzaga*, 536 U.S. at 282.   Instead, § 1396a(a)(23) confers on eligible individuals the "right to choose among a range of qualified providers [ ] without government interference."   *O'Bannon*, 447 U.S. at 785.   The text of the freedom of choice provision therefore guarantees individual patients the right to make health care choices using mandatory, rights-creating language.   *See Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 794 F. Supp. 2d 892, 902 (S.D. Ind. 2011).

But the inquiry into congressional intent to create rights does not end with the text of the particular provision at issue.   In addition to the plain text, the structure of the statute in its entirety must be considered to determine whether Congress intended to confer individual rights.   *Gonzaga*, 536 U.S. at 286.   Defendants contend that Title XIX of the Social Security Act, understood as a whole, does not reflect congressional intent to create individual rights because Congress was concerned with systemic rather than individual compliance.   The best evidence of this purported congressional intent is 42 U.S.C. § 1396c, which empowers the Secretary to suspend payments to a state when the state's Medicaid plans fails to "comply substantially" with the requirements of Title XIX.

1  Arizona is therefore obligated, Defendants argue, only to comply substantially with the

2  requirements of § 1396a(a)(23), and the only remedy for its failure to comply

3  substantially would be for the Secretary to withhold payments.

4  Congress has, however, expressly rejected Defendants' interpretation of the

5  Medicaid Act. In *Suter v. Artist M.*, 503 U.S. 347 (1992), the Supreme Court accepted

6  Defendants' argument and held a Medicaid Act provision unenforceable under § 1983

7  because it could be "read to impose only a rather generalized duty on the State, to be

8  enforced not by private individuals, but by the Secretary." *Id.* at 363. Congress

9  superseded that interpretation and responded directly to *Suter* by enacting 42 U.S.C.

10  § 1320a-2, known as the "*Suter* fix." The *Suter* fix clarified that a provision of the Social

11  Security Act "is not to be deemed unenforceable because of its inclusion in a section of

12  this chapter requiring a State plan or specifying the required contents of a State plan." By

13  enacting 42 U.S.C. § 1320a-2, Congress decreed that the statutory structure of the

14  Medicaid Act, which requires states to submit plans to the Secretary for approval,

15  "cannot detract from or override the otherwise clear 'rights-creating language' Congress

16  used in enacting the free choice provisions." *Ball*, 492 F.3d at 1112 (finding "like the

17  language of . . . [§] 1396a(a)(23) . . . the language of §§ 1396n(c)(2)(C) and (d)(2)(C)

18  satisfies the 'rights-creating' standard set forth in *Gonzaga*"). Congress has therefore

19  foreclosed Defendants' argument that § 1396a(a)(23) was "enacted simply to set forth a

20  policy or practice upon which the receipt of federal funds is conditioned." *Id.*; *see also*

21  *Harris v. Olszewski*, 442 F.3d 456, 461 (6th Cir. 2006) (holding § 1396a(a)(23) "creates

22  enforceable rights that a Medicaid beneficiary may vindicate through § 1983").

23  This conclusion is supported by the fact that Defendants' interpretation of § 1396c

24  would prohibit enforcement of *any* provision of the Medicare Act through § 1983.

25  Binding Ninth Circuit precedent precludes that interpretation. *Ball*, 492 F.3d 1094; *see*

26  *also Watson v. Weeks*, 436 F.3d 1152, 1161 (9th Cir. 2006) (holding § 1396a(a)(10)

27  enforceable under § 1983). And, in addition to the Ninth, Sixth, and Third Circuit cases

28  already cited, other circuits have applied *Gonzaga* and concluded that a variety of

Medicaid provisions create enforceable rights that plaintiffs can vindicate under § 1983. *See Doe v. Kidd*, 501 F.3d 348 (4th Cir. 2007); *Rabin v. Wilson-Coker*, 362 F.3d 190 (2d Cir. 2004); *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 604 (5th Cir. 2004). Therefore, the Court finds that § 1396a(a)(23) unambiguously evinces Congress's intent to create individual rights that can be enforced under § 1983. Plaintiffs have satisfied the first prong of the *Blessing* test.

Under the second *Blessing* prong, a plaintiff must demonstrate that the conferred right at issue is not so "vague" that it would "strain judicial competence" to enforce the right. 520 U.S. at 340. Though there may be legitimate debate about the scope of medical care covered by § 1396a(a)(23), the mandate itself is not so vague that it would be difficult for courts to enforce. *Harris*, 442 F.3d at 462. Rather, the provision sets forth an explicit right that guarantees individuals eligible for medical assistance the ability to choose from among a range of qualified providers without government interference. "A court can readily determine whether a state is fulfilling these statutory obligations by looking to sources such as a state's Medicaid plan, agency records and documents, and the testimony of Medicaid recipients and providers." *Ball*, 492 F.3d at 1115. By reviewing this readily available evidence, a court can determine without difficulty whether a state provides an individual with the free choice guaranteed in the provision. Plaintiffs have met their burden of demonstrating the freedom of choice provision satisfies the second *Blessing* prong.

The third prong of the *Blessing* test requires consideration of whether the statute "unambiguously impose[s] a binding obligation on the States." 520 U.S. at 347. By using the language "a State plan . . . must . . . provide" and "shall not restrict the choice," Congress framed the rights it created in § 1396a(a)(23) in mandatory terms. The relevant terms in the freedom of choice provision are therefore "mandatory rather than precatory." *Sabree*, 367 F.3d at 190 (quoting *Blessing*, 520 U.S. at 341). As a result, the final *Blessing* factor "is perhaps most obviously met by the free choice provisions." *Ball*, 492 F.3d at 1116.

Defendants argue that the mandatory language of the provision should not control because no provision of the Medicaid Act could be mandatory on states that voluntarily participate in the program.  If a state program is not compliant with Medicaid requirements, Defendants contend, the state may lose federal funding but cannot be in violation of any federal law.  The Supreme Court has considered and rejected this argument.  The capacity of the Secretary to curtail funding when states are noncompliant does not foreclose private remedies.  *Wilder v. Wilder*, 496 U.S. 498 (1990).  Although a state's participation in Medicaid is voluntary, once a state elects to participate it "*must* comply with certain requirements imposed by the Act and regulations promulgated by [the Secretary]."  *Id*. at 502 (emphasis added).  As a result, "the power of [the Secretary] to reject state Medicaid plans or to withhold federal funding to States whose plans did not comply with federal law cannot foreclose a § 1983 remedy."  *Ball*, 492 F.3d at 117 (internal quotation marks and citations omitted).  Because the language of the freedom of choice provision is a binding obligation for all states that elect to participate in the Medicaid program, the third *Blessing* prong is satisfied.  All three prongs of the *Blessing* test are therefore met, and § 1396a(a)(23) confers an individual right that is presumptively enforceable by § 1983 .

But even where a right is unambiguously conferred, a state may rebut the presumption that § 1983 is available by showing that "Congress specifically foreclosed a remedy under § 1983."  *Gonzaga*, 536 U.S. at 284 n.4 (citation omitted).  Title XIX does not explicitly preclude individual actions and, as discussed above, the majority of circuits have found provisions of the Medicaid Act enforceable under § 1983.  The remedial component of the Medicaid Act – allowing the Secretary to cut federal funds – "cannot be considered sufficiently comprehensive to demonstrate a congressional intent to withdraw the private remedy of § 1983."  *Ball*, 492 F.3d at 1117 (citing *Wilder*, 496 U.S. at 521-22).  Therefore, nothing in the statute could foreclose a § 1983 remedy.  Medicaid beneficiaries thus enjoy individual rights under § 1396a(a)(23) that can be properly enforced through a § 1983 cause of action.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## 2.    Plaintiffs Are Likely to Succeed on Their Claim that the Arizona Act Violates the Freedom of Choice Provision.

Because Plaintiffs have a right to sue under § 1983, the Court must consider the merits of their claim that A.R.S. § 35-196.05 ("the Arizona Act") violates the freedom of choice provision in § 1396a(a)(23).  Plaintiffs contend that the Arizona Act disqualifies otherwise qualified providers of medical care from Medicaid solely because of the range of services they provide, which violates a Medicaid patient's right to receive care from the provider of his or her choice.  Defendants argue that the Medicaid Act gives Arizona the authority to determine provider qualifications and that the Arizona Act is merely an expression of that authority.

Section 1396a(a)(23) "gives recipients the right to choose among a range of *qualified* providers, without government interference."  *O'Bannon*, 447 U.S. at 785.  That right also entails "an absolute right to be free from government interference with the choice to [receive services from a provider] that continues to be qualified."  *Id.* at 785.  The emphasis on the term "qualified" in *O'Bannon* presages the central conflict between the parties in this case: whether Arizona can limit the range of qualified Medicaid providers to those providers that do not provide abortions without violating the freedom of choice provision.

According to Defendants, the inclusion of the term "qualified provider" in § 1396a(a)(23) demonstrates that a state retains the authority to limit access to providers it deems unqualified.  The freedom of choice provision grants Medicaid patients the right to choose, Defendants contend, only among those providers that the State has determined are qualified for any reason consistent with state law.  And the Arizona Act merely reflects the State's considered judgment that providers who perform abortions as defined in the Arizona Act are not qualified to receive Medicaid funding.

In response, Plaintiffs – and the United States in its statement of interest – argue that the term "qualified" refers only to a provider's ability to perform and bill properly for services.  Congress has specified several narrow exceptions to the freedom of choice

1    mandate that Plaintiffs contend represent the only permissible limits a state can place on
2    an individual's access to a qualified provider.  Congress could not have intended,
3    Plaintiffs argue, to allow states to subvert the freedom of choice provision simply by
4    labeling providers as unqualified; such an interpretation would render the specific
5    exceptions to the provision in the statute superfluous.

6        After considering these arguments, the Court finds that a state's determination of
7    whether a provider is qualified must relate to its ability to deliver Medicaid services.  The
8    Court's conclusion is based on an independent review of the plain meaning of the
9    statutory language, a review of the exceptions Congress has delineated to the freedom of
10   choice provision, cannons of statutory construction, and a measure of deference accorded
11   to the relevant agency's considered interpretation of the provision.

12           **a.**     **The Plain Meaning of the Phrase "Qualified to Perform the
13   Service" Refers to the Ability of the Provider to Perform
     Medicaid Services.**

14       The plain language of § 1396a(a)(23) connects the limitation on an individual's
15   free choice of providers to those providers that are "qualified" to the ability of the
16   provider "to perform the service or services required."  42 U.S.C. § 1396a(a)(23)(A).
17   That plain language does not support the Defendants' claim that by using the term
18   "qualified" Congress intended for states to have the authority to exclude whole groups of
19   providers for any state policy reason.  A medical service provider that is "qualified" is
20   one "[p]ossessing the necessary qualifications; capable or competent, [e.g.] a qualified
21   medical examiner."  Black's Law Dictionary (9th ed. 2009).  The plain meaning of the
22   phrase "[providers that are] qualified to perform the service or services required" thus
23   limits freedom of choice to those providers that are competent to provide the needed
24   services.  Implementing regulations give the states the authority to limit freedom of
25   choice under the provision by "[s]etting reasonable standards relating to the qualifications
26   of the providers." 42 C.F.R. § 431.51(c)(2).  So states unquestionably retain the authority
27   to set qualification standards, but only reasonable standards related to the ability of the
28

provider to perform the Medicaid services in question. Defendants do not contend that the Plaintiff providers are unfit to perform family planning services under Arizona's Medicaid plan; indeed, Defendants argue that the providers could continue providing these services if they would stop performing abortions or create a separate entity. Within the plain meaning of the term, the Plaintiff providers are therefore "qualified" to perform Medicaid services. As a result, the plain meaning of the text of § 1396a(a)(23) supports Plaintiffs' argument that the provision guarantees Medicaid recipients the right to select Plaintiff providers for those services, unless an exception to the provision applies.

### b. Section 1396a(p)(1) Does Not Give States Authority to Disqualify Providers for Reasons Unrelated to the Purposes of the Medicaid Act.

The inquiry is not limited to the text of § 1396a(a)(23), however, because other provisions of Title XIX create exceptions to the general mandate that Medicaid patients have free choice of qualified providers. These exceptions allow both the Secretary and the states to exclude providers in a variety of situations. Within § 1396a(a)(23) itself, for example, Congress clarified that "nothing in this paragraph shall be construed as requiring a State to provide medical assistance for such services furnished by a person or entity convicted of a felony under Federal or State law for an offense which the State agency determines is inconsistent with the best interests of beneficiaries under the State plan." And the Secretary has discretion to allow states to restrict a Medicaid recipient's choice of providers to those providers who "meet, accept, and comply with the reimbursement, quality, and utilization standards under the State plan." 42 U.S.C. § 1396n(b)(4). Most central to this dispute, § 1396a(p)(1) allows states to exclude providers for a number of enumerated reasons "[i]n addition to any other authority." 42 U.S.C. § 1396a(p)(1). Section 1396a(p)(1) provides:

> In addition to any other authority, a State may exclude any individual or entity for purposes of participating under the State plan under this subchapter for any reason for which the Secretary could exclude the individual or entity from participation in a program under subchapter XVIII of this chapter under section 1320a-7, 1320a-7a, or 1395cc(b)(2) of this title.

Defendants argue that § 1396a(p)(1) gives states the authority to determine provider qualifications for any reason that advances state law and policy. Plaintiffs argue that § 1396a(p)(1) does not give states sweeping authority to determine qualification standards; rather, it specifies narrowly drawn exceptions to the freedom of choice guarantee, all of which are related to excluding providers for fraudulent or illegal activities. Both sides cite to the legislative history of § 1396a(p)(1) to support their proposed interpretations. Defendants note the Senate report accompanying the bill states that § 1396a(p)(1) "is not intended to preclude a State from establishing, under State law, any other bases for excluding individuals or entities from its Medicaid program." S. Rep. No. 100-109, at 20 (1987), reprinted in 1987 U.S.C.C.A.N. 682, 700. Plaintiffs highlight that the same Senate report indicates that Congress intended § 1396a(p)(1) to protect Medicaid programs "from fraud and abuse, and to protect the beneficiaries of those programs from incompetent practitioners and from inappropriate or inadequate care." *Id*. at 1-2, 682. And the United States argues that the phrase "[i]n addition to any other authority" is merely a savings clause at the beginning of a specific authorization to the states to exclude providers in a narrow set of circumstances involving fraud and abuse. Whether the Arizona Act violates the freedom of choice provision therefore turns primarily on the scope of the § 1396a(p)(1) exception.

The Court is not persuaded that Congress intended § 1396a(p)(1) to be a sweeping grant of authority to the states that would allow them to disqualify any provider from participating in Medicaid for nearly any reason, or for reasons unrelated to the purposes of the Medicaid Act. As an initial matter, Congress's use of the term "qualified" in § 1396a(a)(23) is distinct from the term "exclude" as used in § 1396a(p)(1). "Exclude" has a specific meaning as defined in this statute: "the refusal to enter into or renew a participation agreement or the termination of such an agreement." 42 U.S.C. § 1396a(p)(3). In order to "exclude" a provider under the statute, a state must give the provider to be excluded notice of the state's intent to exclude, 42 C.F.R. § 1002.212, and an opportunity to appeal the exclusion before it is imposed, 42 C.F.R. § 1002.213. A

state's authority to exclude providers is not, therefore, coextensive with the state's authority to set generally applicable provider qualifications. Rather, the state's power to exclude focuses on individual providers who are excluded on a case-by-case basis after notice and opportunity to appeal.

Defendants' conflation of a state's power to exclude an individual provider with the state's authority to set reasonable qualifications for all providers permeates Defendants' argument. All of the provisions on which Defendants rely for their contention that states have authority to define a "qualified" provider however they see fit set forth a state's authority to "exclude" providers. None discusses a provider's qualifications. Indeed, at oral argument Defendants' counsel repeatedly referred to § 1396a(p)(1) as the "qualification provision of the Medicaid statute" despite the fact that Congress did not use the word "qualified" or "qualification" anywhere in that provision. If Congress had intended § 1396a(p)(1) to establish states' authority to determine provider qualifications, it knew how to say so by using the word "qualified" as it did in § 1396a(a)(23). Therefore, even if the Court were to accept the Defendants' argument that § 1396a(p)(1) permits a state to *exclude* a provider for any reason established by state law, the power to exclude would not translate directly to the power to *disqualify* an entire class of providers based on services it offers outside the Medicaid program.

Further, the interpretation of § 1396a(p)(1) that Defendants advance is not plausible because it renders the remainder of the exceptions to the freedom of choice provision superfluous. If a state could rely on § 1396a(p)(1) to exclude a class of providers for any non-arbitrary reason, then the remainder of the exceptions, which carefully set forth circumstances under which the Secretary and states have authority to exclude providers, would be unnecessary. Such an interpretation undermines "the cardinal rule of statutory interpretation that no provision [of a statute] should be construed to be entirely redundant." *Kungys v. United States,* 485 U.S. 759, 778 (1988); *see also Colautti v. Franklin,* 439 U.S. 376, 392 (1979) ("[It is an] elementary canon of statutory construction that a statute should be interpreted so as not to render one part

inoperative."). Rather, "it is our duty to give effect, if possible, to every clause and word of a statute." *Khatib v. County of Orange*, 639 F.3d 898, 904 (9th Cir. 2011) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

The exceptions to the freedom of choice provision are narrow and specific. For example, Congress carefully circumscribed the Secretary's own authority, set forth in § 1396n(b)(4), to waive the general requirements of §1396a and allow states to restrict Medicaid beneficiaries' choice of provider. The Secretary may only grant such a waiver when a state uses standards to limit choice that "are consistent with access, quality, and efficient and economic provision of covered care and services." 42 U.S.C. § 1396n(b)(4). Further, the Secretary may only allow states to limit choice if "such restriction does not discriminate among classes of providers on grounds unrelated to their demonstrated effectiveness and efficiency in providing those services." *Id*. Even when the Secretary has limited the freedom of choice requirement, in other words, a state may not restrict a beneficiary's choice of provider for reasons unrelated to the provider's ability to provide Medicaid services. If § 1396a(p)(1) gave states the independent authority to restrict choice of providers for any reason, both the Secretary's authority to grant states waivers of the freedom of choice requirement and the limitation on that authority in § 1396n(b)(4) would be rendered inoperative. Because Congress would not have drafted the statute to make the specific instances in which the Secretary and a state could restrict choice of providers redundant, Defendants' proposed interpretation of § 1396a(p)(1) is in error.

Finally, if a state's exclusion authority allowed the state to disqualify an entire class of providers for any reason supplied by state law, the freedom of choice guarantee of § 1396a(a)(23) would be greatly weakened. The guarantee would be subject to state policies and politics having nothing to do with the Medicaid program. It is unlikely that Congress would have included a broad guarantee of free choice among qualified providers, subject to enumerated and well-defined exceptions, and then created in the states authority to circumvent that guarantee for nearly any reason. The legislative history of § 1396a(p)(1) does not, therefore, override the statutory guarantee of free

choice in § 1396a(a)(23).  Indeed, the Senate report as a whole serves to clarify that the overarching purpose of § 1396a(p)(1)  is to grant authority to exclude a provider based on the provider's quality of services – not to disqualify a provider based on its scope of services outside Medicaid.  S. Rep. No. 100-109; *see also Planned Parenthood of Ind.*, 794 F. Supp. 2d at 904.

At the preliminary injunction stage, the Court need not define the precise contours of a state's authority to set reasonable standards for provider qualifications.  A state's power to determine qualifications may not be as narrowly drawn as Plaintiffs suggest.  But for the Court to determine that Plaintiffs are likely to succeed on the merits, it is enough to find that a state's power to set reasonable qualification standards cannot be as broad as Defendants claim.  Simply put, a state's determination of whether a provider is qualified to perform Medicaid services must at least be related to Medicaid services.  The fact that the Plaintiff providers perform legally protected abortions does not affect their ability to perform family planning services for Medicaid patients.  The language of the Medicaid Act, basic canons of statutory construction, and the legislative history of the provisions involved therefore compel the conclusion that Arizona lacks the authority to disqualify providers from the Medicaid program based solely on their provision of lawful abortion services.  Because the Arizona Act would disqualify providers for reasons unrelated to Medicaid, Plaintiffs are likely to succeed on their claim that the Act violates the freedom of choice provision of § 1396a(a)(23).

### c.    Agency Interpretations of § 1396a(a)(23) Are Entitled to Some Deference.

To the extent that there is remaining ambiguity about the meaning of § 1396a(a)(23) in light of § 1396a(p)(1), persuasive agency interpretations of these provisions further demonstrate that Plaintiffs are likely to succeed on the merits.  The Department of Health and Human Services ("HHS"), the agency charged with administering the Medicaid program through its delegee Centers for Medicare and Medicaid Services ("CMS"), has interpreted the statutes and implementing regulations at

1    issue in this case as this Court does.  The most important implementing regulation creates

2    a narrow exception to the freedom of choice provision that permits a state to establish

3    "reasonable standards relating to the qualifications of providers."    42 C.F.R.

4    § 431.51(c)(2).    The Agency has interpreted "reasonable standards relating to the

5    qualifications of providers" to refer to standards that are relevant to providers' ability to

6    render Medicaid services and to properly bill for those services.

7        Most recently, CMS reviewed in 2011 Indiana's state Medicaid plan, which

8    included a restriction very similar to the Arizona Act.  Indiana's plan proposed to

9    disqualify health care providers that performed abortions from state contracts and grants,

10   including those that distributed federal Medicaid funds.  In its initial review, the CMS

11   Administrator, after consulting with the Secretary, refused Indiana's plan because the

12   restriction violated § 1396a(a)(23) and its guarantee of free choice of providers.  (Doc.

13   51-3.)  Following that decision, CMS issued an informational bulletin to all states in

14   which the agency reiterated its interpretation in a "review of longstanding federal law."

15   (Doc. 51-4.)  The bulletin advised the states that they were "not . . . permitted to exclude

16   providers from the program solely on the basis of the range of medical services they

17   provide."  (*Id.*)  CMS further clarified its interpretation that "Medicaid programs may not

18   exclude qualified health care providers . . . from providing services under the program

19   because they separately provide abortion services . . . ."  (*Id.*)

20       Planned Parenthood of Indiana filed an action in the district court seeking a

21   preliminary injunction to prevent Indiana from enforcing its defunding law.  In that case

22   Indiana argued, as Defendants do here, that CMS's interpretation should be accorded no

23   deference by the district court because the CMS decision letter was not final and because

24   there was no statutory gap for the agency to fill in interpreting § 1396a(a)(23).  *Planned*

25   *Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 794 F. Supp. 2d 892,

26   907 (S.D. Ind. 2011).  The court rejected Indiana's argument, finding that "some level of

27   deference is warranted" without deciding whether heightened deference under *Chevron v.*

28   *NRDC*, 467 U.S. 837 (1984), was warranted.  The court reasoned that "in cases such as

1    those involving Medicare or Medicaid, in which CMS, a highly expert agency,

2    administers a large complex regulatory scheme in cooperation with many other

3    institutional actors, the various possible standards for deference – namely, *Chevron* and

4    *Skidmore* – begin to converge." *Id*. at 908 (quoting *Estate of Landers v. Leavitt*, 545 F.3d

5    98, 107 (2d Cir. 2008)).

6        Since the Southern District of Indiana issued its opinion, additional administrative

7    proceedings have further strengthened the case for awarding some deference to the

8    agency's interpretation.  Indiana sought reconsideration of CMS's initial disapproval of

9    its Medicaid plan, which CMS denied.  In its letter of denial, CMS emphasized that

10   Indiana's restriction was impermissible because it would particularly affect access to

11   family planning providers, which were subject to additional protection for beneficiary

12   choice of providers under § 1396a(a)(23)(B).  (Doc. 7-1 at 10.)  Indiana then sought an

13   administrative hearing regarding the denial, a hearing which included full briefing and

14   oral argument before two CMS hearing officers.  (*Id*.)  Following the argument, the CMS

15   Presiding Officer issued a detailed proposed decision on June 20, 2012.  The Officer

16   concluded that Indiana's restriction was "contrary to the plain language of the freedom of

17   choice provision" and that § 1396a(p)(1) "[did] not apply because it addresses

18   exclusionary powers over specific individuals or entities" rather than provider

19   qualifications.  (*Id*. at 25.)

20       Defendants argue that the Court should award no deference to these interpretations

21   because there is no gap to fill in interpreting § 1396a(a)(23) or § 1396a(p)(1) and because

22   there has been no adjudicatory process resulting in an informed determination of the

23   statute's meaning.  The Court disagrees.  Even though the proposed decision of the CMS

24   presiding officer (Doc. 7-1) is subject to final review by the CMS administrator, it is

25   entitled to some deference.  It is not necessary to decide at this stage whether full

26   *Chevron* deference is appropriate because the agency's interpretation is persuasive

27   authority "upon the thoroughness evident in its consideration, the validity of its

28   reasoning, its consistency with earlier and later pronouncements, and all those factors

which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  The Court finds that CMS's interpretation was carefully reasoned, decided after thorough consideration of arguments from both sides, and consistent with both prior and subsequent agency pronouncements.  Indeed, the agency's interpretation is persuasive independent of the level of deference it is owed.

In addition, ascribing some level of deference to the expert agency's thoroughly considered interpretation of the Medicaid Act is "squarely in line with a thorough body of case law."  *See Planned Parenthood of Ind.*, 794 F. Supp. 2d at 906 (collecting cases where courts apply *Chevron* deference to CMS approval or denial of state Medicaid plans).  After the agency has further considered the denial, held trial-like proceedings, and issued a carefully reasoned proposed decision, the case for that deference is even stronger.  The agency's persuasive interpretation of the statutes at issue here – consistent with the Court's independent interpretation – weighs heavily in favor of granting injunctive relief in this case.

For all of these reasons, the Court finds that Plaintiffs are likely to succeed on the merits of their claim that the Arizona Act violates the freedom of choice provision of the Medicaid Act.  Because Plaintiffs would be successful at trial if they were successful on any one of their claims, the Court need not evaluate whether Plaintiffs are likely to succeed on the merits of their other claims at the preliminary injunction stage.

### B.   Plaintiffs Will Suffer Irreparable Harm Without Injunctive Relief.

If Defendants are permitted to implement the Arizona Act, Plaintiffs Planned Parenthood of Arizona ("PPAZ") and Dr. Reuss will be unable to provide healthcare services to their patients who are Medicaid beneficiaries, including Doe Plaintiffs, and will lose revenue from those services.  Both harms are irreparable.

First, PPAZ patients who are also Medicare beneficiaries, including the three Doe Plaintiffs in this case, will be denied their choice of qualified health care providers for family planning services.  Should the Court fail to issue a preliminary injunction and later be reversed, these Medicaid patients are virtually certain to be denied the ability to

continue to seek care from the provider they have selected because, as a practical matter, PPAZ will be forced to give up its Medicaid services.  The denial of that freedom of choice is exactly the injury that Congress sought to avoid when it enacted § 1396a(a)(23).  The purpose of the freedom of choice provision is to allow Medicaid recipients the same opportunities to choose among available providers of covered health care services as are normally offered to the general population.  A preliminary injunction to preserve the status quo properly avoids the risk that Doe Plaintiffs will needlessly suffer that irreparable injury while this case is pending.

Second, PPAZ and Dr. Reuss will immediately lose revenue from Medicaid funding, around $350,000 annually in PPAZ's case.  Plaintiff providers would be unable to recover this lost revenue as damages after a judgment on the merits in their favor because of the Eleventh Amendment's bar to seeking damages from a state.  Therefore, Plaintiffs have met their burden of demonstrating that it is likely they will suffer irreparable harm in the absence of a temporary injunction.  *Winter*, 555 U.S. at 22.

## C.  The Balance of Equities Favors Plaintiffs.

Defendants argue that prohibiting health care providers who perform elective abortions from receiving Medicaid funding will serve the State's interest by preventing public funding of abortions.  As a result, Defendants claim that the State will be harmed by a preliminary injunction as taxpayer funds will be used to subsidize abortions while it is in force.  This argument ignores evidence that PPAZ complies with all federal and state requirements to ensure that public funds are not used for abortion services – evidence supported by the fact that PPAZ has participated in Arizona's Medicaid program without incident for more than twenty years.  Because PPAZ is a fee for service provider, PPAZ bills Arizona's Medicaid program only for the specific services it has provided Medicaid patients.  PPAZ does not bill Medicaid for most of the abortion services it provides because federal law prohibits the use of federal funds to pay for most abortions.

In order to support their claim that state taxpayer funds are being used by PPAZ to subsidize abortions, Defendants argue that any Medicaid funds paid to PPAZ for other

medical services indirectly subsidize abortions by supporting the operation as a whole. Defendants contend that taxpayer money that goes to PPAZ for other services is used to subsidize abortions because the money covers overhead and other shared expenses that allow PPAZ to perform abortions.   But the Medicaid reimbursements PPAZ receives cover only about half the cost of providing Medicaid services.   As a result, after the Medicaid services that PPAZ provides are paid for, there is no excess funding that could be used to subsidize abortions.

Further, if the harm the Arizona Act sought to avoid was indirect subsidization of abortions, the injury could be prevented by reducing the state funding that PPAZ receives for Medicaid services to ensure no excess funds were available to pay for the alleged shared expenses.   But at oral argument, Defendants' counsel contended that even if the reimbursement PPAZ received for Medicaid services were only ten percent of the current rate, the State would still be harmed by subsidizing abortions.   By taking this position, Defendants reveal their argument to be untenable; at that rate, PPAZ would lose so much money offering Medicaid services that it would approach the absurd to say that Medicaid funds were used to "subsidize" abortions.   The core remaining of Defendants' argument that the State would be harmed is thus that money is fungible, and that any amount of funding, no matter how small, could be theoretically used by PPAZ to fund abortion services.   At that level of abstraction, Defendants' alleged harm is too tenuous to be given weight in the balancing of equities.   If there were any merit – and there is none – to Defendants' argument that the State suffers some abstract harm from indirectly supporting abortion services, that harm would be outweighed by the direct harm Plaintiffs will suffer if the Arizona Act is enforced.   Granting the injunction will simply require Arizona to continue to allow PPAZ to receive Medicaid funds as it has since at least 1991.  The balance of harms is therefore entirely in Plaintiffs' favor.

> **D.    Temporarily Enjoining Enforcement of the Arizona Act Is in the Public Interest.**

The public interest is advanced by allocating Medicaid funds consistently with congressional intent to ensure that Medicaid beneficiaries have the freedom to receive family planning services from the qualified health care provider of their choice. PPAZ uses Medicaid funding to provide family planning services to approximately 3,000 Medicaid patients each year. Beyond the Doe Plaintiffs in this case, these 3,000 patients would lose the opportunity to receive health care services from the health care provider they have chosen. Congress has made clear its specific intent to protect Medicaid beneficiaries' freedom of choice in the family planning context, 42 U.S.C. § 1396a(a)(23)(B), and it is in the family planning context that the Arizona Act would limit the choice of PPAZ's Medicaid patients. Preserving the status quo with a preliminary injunction ensures that those patients are able to continue to select the health care provider of their choice until a trial on the merits can be held. In addition, PPAZ provides health care services to many Medicaid patients in areas underserved by other health care providers who may have difficulty securing alternative care. Ensuring that more than 3,000 Medicaid patients have continuity of health care services during the pendency of this case is in the public interest. For these reasons, enjoining Defendants from enforcing the Arizona Act is in the public interest.

## III.   BOND

A preliminary injunction must be conditioned on the plaintiff posting security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The amount of the bond is within the Court's discretion. *See Save Our Sonoran, Inc. v. Flowers,* 408 F.3d 1113, 1126 (9th Cir. 2005). A preliminary injunction in this case will not cause the Defendants to suffer any monetary damages. In the absence of such injury, only a nominal bond is required. A bond will therefore be required in the amount of $100.

## IV.   DEFENDANTS' MOTION TO DISMISS COUNTS I AND II

Defendants moved to dismiss Plaintiffs' Count I, that the Arizona Act violates § 1396a(a)(23), and Count II, that the Arizona Act violates the Supremacy Clause of the United States Constitution.  When analyzing a complaint for failure to state a claim to relief under Rule 12(b)(6), the well-pled factual allegations "are taken as true and construed in the light most favorable to the nonmoving party." *Cousins v. Lockyer,* 568 F.3d 1063, 1067 (9th Cir. 2009) (internal quotation marks and citation omitted).  To avoid a Rule 12(b)(6) dismissal, the complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).  This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) (quoting *Twombly,* 550 U.S. at 556).  Dismissal is also appropriate where the complaint lacks a cognizable legal theory or lacks sufficient facts alleged under a cognizable legal theory.  *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990).

A motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) can be based on the face of the Complaint or extrinsic evidence demonstrating lack of jurisdiction on the facts of the case.  *White v. Lee,* 227 F.3d 1214, 1242 (9th Cir. 2000).  In evaluating a facial attack on jurisdiction, the court must accept the factual allegations set forth in the Complaint as true.  *See Miranda v. Reno,* 238 F.3d 1156, 1157 n.1 (9th Cir. 2001).  The burden rests with the party asserting jurisdiction.  *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377 (1994).

On Count I, Defendants argue there is no right of action to enforce the Medicaid Act under § 1983.  Because Plaintiffs do have a private right of action for the reasons stated above, Part II.A.1, Defendants' Motion to Dismiss Count I will be denied.

On Count II, Defendants argue that Plaintiffs cannot state a preemption claim because there is no state law that conflicts with the Medicaid Act.  A state law that violates the Medicaid Act does not conflict with federal law, according to Defendants, because the state's participation in Medicaid is voluntary.  Even if the Arizona Act does

not comport with § 1396a(a)(23), the only remedy would be for the Secretary to refuse to fund the state's Medicaid plan.  Defendants further argue that Plaintiffs have no private right of action to challenge their disqualification from Medicaid through a federal preemption claim.  Defendants contend that Plaintiffs may not raise a direct Supremacy Clause challenge under the Medicaid Act statute because the Medicaid Act was enacted under the Spending Clause.

Defendants first argument is not persuasive; once again, though a state's "participation in the Medicaid program is entirely optional, after a State elects to participate, it must comply with the requirements of [the Medicaid Act]."  *Harris v. McRae*, 448 U.S. 297, 301 (1980).  "There is of course no question that the Federal Government, unless barred by some controlling constitutional prohibition, may impose the terms and conditions upon which its money allotments to the States shall be disbursed, and that any state law or regulation inconsistent with such federal terms and conditions is to that extent invalid."  *King v. Smith,* 392 U.S. 309, 333 n.34 (1968).  More recently, the Supreme Court in *PhRMA v. Walsh*, 538 U.S. 664 (2003), implicitly rejected the contention that a plaintiff could not bring a preemption claim under federal Spending Clause legislation.  The Ninth Circuit adopted the implicit rejection in *PhRMA*, and held that "[u]nder the well-established law of the Supreme Court, this court, and the other circuits, a private party may bring suit under the Supremacy Clause to enjoin implementation of state legislation allegedly preempted by [the Medicaid Act]."  *Indep. Living Ctr. of S. Cal., Inc. v. Shewry*, 543 F.3d 1050, 1065 (9th Cir. 2008).  Under *Shewry*, Plaintiffs have stated a claim under the Supremacy Clause.

The Court notes – as have other district courts recently considering the availability of a freestanding claim under the Supremacy Clause – that the Supreme Court granted certiorari in its October 2011 term "to decide whether Medicaid providers and recipients may maintain a cause of action under the Supremacy Clause to enforce a federal Medicaid law – a federal law that, in their view, conflicts with (and pre-empts) state Medicaid statutes that reduce payments to providers."  *Douglas v. Indep. Living Ctr. of S.*

*Cal., Inc.*, __ U.S. __, 132 S.Ct. 1204, 1207 (2012).  However, the Supreme Court remanded that case to the Ninth Circuit in light of changed factual circumstances without answering the underlying legal question.  *See Planned Parenthood of Cent. N. C. v. Cansler*, No. CV11-0531, 2012 WL 2513510 (M.D.N.C. June 28, 2012).  Two other district courts have conducted a similar Supremacy Clause analysis while awaiting the Supreme Court's decision in *Douglas*.  Both courts concluded that the present weight of authority allows such a preemption claim under the Spending Clause.  *Planned Parenthood of Cent. N. C. v. Cansler*, 804 F. Supp. 2d 482, 488-89 (M.D.N.C. 2011); *Planned Parenthood of Ind.*, 794 F. Supp. 2d at 911.  The Court finds that reasoning persuasive.  Further, in the absence of contrary instruction from the Supreme Court, the Ninth Circuit's holding in *Shewry* remains binding precedent.  543 F.3d at 1065-66. Thus, Plaintiffs may bring a preemption claim under the Supremacy Clause, and the claim is within the Court's federal question jurisdiction under 28 U.S.C. § 1331.  Having met their burden to establish jurisdiction, Plaintiffs have alleged sufficient facts to state a claim for relief under the Supremacy Clause that is plausible on its face.  For these reasons, Defendants' Motion to Dismiss Count II will be denied.

IT IS THERFORE ORDERED that Plaintiffs' Motion for Preliminary Injunction (Doc. 6) is GRANTED, conditioned upon Plaintiffs posting a bond in the amount of $100 pursuant to Fed. R. Civ. P. 65(c).

IT IS FURTHER ORDERED that Defendants' Motion to Dismiss Counts I and II (Doc. 37) is DENIED.

Dated this 19th day of October, 2012.

_____
Neil V. Wake
United States District Judge